Henry Jacobs, your Honor, is ready to proceed. Please go ahead. Good morning, Judge Hawkins, Judge Bate, and Judge Bybee. The totality of facts of this lengthy and convoluted case demands that a new trial be conducted. There's little difference of opinion here, frankly, as to the applicable law, but it is the facts in detail in this matter which demand the very closest examination and evaluation. I cannot overstress that in order to ensure that a just outcome should result. I have spent more time with the facts of this matter than I have with probably any other case. The facts in every possible medium, including audio and video and going through and timing how long something took and when it occurred and listening to the voices as they were actually conducting, for example, these prison interviews, all of this is tremendously important to the matter that we're asked to look at here. I've never met a case that was like this. It's very common for us to have an assistant read a tape or maybe to read a transcript or to have somebody else do it, but this is, I've learned repeatedly in my association with this case, not the way to handle this matter. Judge Hawkins? I'm sorry, sir. You looked like you had a question. The trial here featured Just listen intently, counsel. Yes, sir. Just listening. I'm just listening. Yes, sir. The trial here featured three principal defects. The improper admission of extrinsic statements of Detective Garcia that indicated that the defendant was, at that time of the trial, incarcerated in a prison. The coerced confession, and I'm going to use that word, coerced confession of this defendant over almost six hours of interviews within a prison by two police officers on two occasions, in addition to which there was a polygraph that didn't come into evidence. Was he Mirandized? This is a critical question here. Here's what occurred. And the question asks for a yes or no. Yes, sir. Yes. I would say within cognitive limits, he was Mirandized. And he signed a statement, a written statement on both occasions. But it remains our contention, this was not an effective admission of Miranda on these particular facts in this particular location. Under these particular circumstances, he was being examined by police officers in a day room, in a prison, with passersby and other individuals present. It was not a private setting. And they were talking about child molestation of his daughters in this comforting, soothing environment where everyone concedes, including the government, that if the occupants of this prison had come to know of it, this man's life would have been in actual factual danger. And that they did this for five and a half or six hours in total. Over two years. So the interviews took place two years apart. Yes, ma'am, that is correct. So your six hours is maybe three hours in each interview. He received Miranda warnings. I believe your brief concedes that the Miranda warnings were accurate. And he testified at the trial that he knew, he understood the Miranda warnings. He had received Miranda warnings on other occasions. He was an adult. And he understood that he could refuse to answer questions. Right? I mean, so what you're saying is, against that backdrop, we have to conclude that his confession was, his statements were coerced because this took place at a visiting room or a day room at the prison. Not merely for that reason. That is one of the factors. We are confronted here over and over again in this case with multi-factor analysis. One of the reasons why his will was overborne was the forum. Was the situation. Confronted with police officers. And he stated that he wanted to talk to them so that they wouldn't tell the other people at the prison, even the guard, as to what the suspicion was and what he was being confronted with. The other is, this man was mentally ill. He subsequently underwent not only examination, was found incompetent, but he was sent to Butner. Very significant amount of time later. Right? So there's nothing in the record that suggests that he was suffering from a mental illness at the time of the interviews. I don't concede that. In fact, I find the notion of a person who, once upon finding out what he was being confronted with, to sit there for six hours and have a chat with these officers. Well, counsel, when you say it that way, that's misleading. He didn't sit there for six So this isn't as if this man walked into a room and for six hours they interrogated him. If I may, Judge Bade, the first interview on 2015 took two hours and five minutes. The second interview in 2017, three hours and 27 minutes. And I would point out that in those two interviews, the first interview, the government or the investigators did not get around to the subject matter of the interview until one hour and seven minutes. Okay. Now, is there any case law that suggests that if the officers speak to a person, a suspect, and don't ask a particular question immediately, you're saying, you know, they're talking to him, they're building rapport with him, they're asking him questions, that that somehow mitigates or eliminates the effectiveness of their Miranda warnings? What I would say, Your Honor, is that it attenuates it the further it gets from the admission of the warning. And we also have an attenuated warning to the extent that the officers sort of sought to assure him, it's very clear, that this is sort of a formality because you're here, but So what they said to him was, you're in custody, so we need to give you these warnings, which is a true statement. Miranda only applies to custodial interrogations. So the officers made a true statement to a man who had received Miranda warnings in the past who indicated at that time that he understood. And he understood he could ask questions and he could stop talking. Respectfully, Your Honor, the way I read it was that they told him, we just have to do this because you happen to be in prison. Well, we have the transcript. I've read the transcript.  I've read the transcript. You can characterize it as you wish, but what they told him is, we have to give you these warnings because you're in custody. And then he said, I understand, and they started asking him questions. Judge Bay, that is exactly what happened. Factually, that is what took place. My concern, going back to the mental illness, I am hard-pressed. I have never seen a criminal defendant spend this amount of time, especially having learned what he's accused of, talking with the officers in the manner in which he did. It's astonishing. So the interviews were in 2015 and 2017. When was he evaluated for mental competency? He was evaluated all the way, and I have it right here. It was in 2019 and 2020. Okay. So four years, so four years after the first interview, two to three years after the second interview, did you contend in the district court that he was mentally incompetent at the time that he gave either of these interviews? Not incompetent, no. Nor is that, I believe, the legal standard to which we must look. The question is, did his mental capacity at that time in any way obviate or attenuate the effectiveness of his understanding? Did you raise – I don't remember seeing what the nature of the competency was, or the incompetency in 2019, 2020 he was being evaluated for. Did you raise any of those details and try to assert that they were also present in 2015, 2017? No, not at the preclusionary hearing, Your Honor, if that's what the court is asking. Okay. Then what relevance is the fact that he was later evaluated for mental competency? I think that it is a factor that we must look toward. But what do we do with it? Well, it's one of the totalities. Do we have the details of why he was evaluated in 2019 or 2020? Certainly he had not been evaluated prior. Right, right. But do we have the details of why he was – what he was evaluated for in 2019? Certainly. He was having problems. I was his trial lawyer. He was having repeated problems getting along with the lawyer, understanding the law, accepting the law. He was sort of delusional about the law. The Butner folks concluded that he was one of these, what do they call them, sovereign citizens. But he was examined by two physicians in Tucson, both of whom concluded that he was so delusional in 2019, two independent doctors, that he was incompetent to proceed in court. He would have outbursts in court. He had troubles with Judge Velasco. It was a very pervasive feature of his personality. And yet I don't think that any of those things really manifest themselves in the transcripts. I disagree, sir. I do disagree. The length and the engagement that he has with these officers, these long monologues that he gives, I urge you to review the transcripts. It's astonishing. He'll sit there and go on for a solid page of transcript with literally no question in front of him. This sort of conduct is insane when confronted. Once he came to know over an hour after the first interview began, once he came to know, the average criminal defendant would simply clam up, so to speak. He did the opposite. He sat there like a running faucet for almost six hours. So I think mental health is among the factors, respectfully among the factors, that we need to look at when determining voluntariness. It's this Preston analysis. It's not one factor where all of the issues here are multifactor. And this is an example. One of your issues raised in the briefs is the trial court's denial of your motion for mistrial. You tried the case, right? Yes, sir. Based on the detective testifying about where your client was at the time of these interviews? Yes, sir. That is correct. Tell us how that's there. Judge, I was rather shocked. There was a ruling by Judge Jorgensen that no mention of prison was to be made, for understandable reasons. We completed the entire first trial with no incidents whatsoever, no problems. Detective Garcia was unable to be a witness in the first trial. He was a witness in the second trial. I still don't know what his function was other than to amplify Detective Grant's statements. However, he began on direct examination by the government's attorney by stating he was asked, what was his demeanor like? And he responded, well, he was doing really well. He was getting along very well with the other inmates. And I was flabbergasted. You objected at that point? Yes, sir. And we went to the bench that minute and I said, Your Honor, this is a mistrial. And what did Judge Jorgensen say? Well, she was actually curious. It's in the brief. She was actually curious as to whether it was intentional or not. The government's counsel assured her it was not, but it was so striking. I think that was her first reaction. I'm speculating. The transcript's plain as it is. Didn't she admonish the jury? No, she did not. And that's very important. I was asked, I said, Judge, this is a mistrial. It's the only remedy. And she said, well, what if I don't give a mistrial? What admonition would you like? And I said, Judge, you are giving me an impossible problem. So she offered you a curative instruction? Certainly. And you rejected it? Yes, I did.  So then your client later testified that he had been convicted of two felonies. He placed this information before the jury in the trial as well? That is correct. Okay. So we would have to conclude that this statement by the detective had an impact on the verdict. The fact that they heard the detective say he was thinking something like he was helping other inmates, he was doing well, actually a positive statement other than, of course, the problem that it reveals that he's incarcerated at the time. But then he later says he was convicted of two felonies. So that seems much more damning. And that was placed before the jury by the defendant himself. So how could this one comment have affected the verdict? I'm hopeful to reserve some time, Judge. But basically, he had not made a decision as to testify or not at the point of the government's direct case. So are you going to say that he decided that because the detective made this remark that he better go ahead and testify that he'd committed two felonies, been convicted of two? He might have, and he had the right to not. And that decision was made for him by this act of the detective and the government. The decision was taken out of his hands and placed into a Hobson's Choice. That was the board I used in trial. And that's not right. They can't do that. I don't know how you can answer this, but how did he come to the decision that it's going to be better if I testify and put my criminal record before the jury? I was the president of the Gaming Law Society at UNLV. People were always asking me to divine the impossible. I don't know is the answer. So we'd have to speculate. We would have to speculate. Okay. So you have about a minute and a half left. I appreciate it. Do you want to reserve that? Yes, ma'am. Thank you. Good morning. May it please the Court. My name is Craig Russell, appearing on behalf of the United States. I'm going to start where the Court just left off with respect to the Court declining to declare a mistrial, because I think there's an important point to be made here. The district court here did correctly decline to declare a mistrial based upon the unsolicited, isolated, and vague reference the detective made to the defendant's inmate status. And just real quick, I think what I just heard from defense counsel was he wasn't sure if his client was going to testify and that somehow this comment may have played into the defendant's decision to testify. I would point out to the Court that defense counsel promised during opening statement in this case that his client was going to take the stand and deny these charges. So I don't think there's a plausible argument to be made that somehow this vague statement referenced to the inmate status contributed to the defendant's decision to testify in this case. And I just wanted to make that clear at the very outset. Also, this type of vague and isolated statement has repeatedly been held by this Court to not justify a mistrial. Here, there was no specific attention brought to the comment at the time it was made, and the statement conveyed no specific information as to the defendant's criminal history. This Court, in cases like Yarborough and Allen, have repeatedly said that this type of reference to a prison record does not warrant a mistrial. And there's also several unpublished cases reaching the same result that we cited in our brief and were cited below. And it's especially true in this case. As the Court mentioned a moment ago, the defendant here did take the stand and tell the jury himself that he had two prior felony convictions. So in light of that disclosure to the jury, this vague statement, I think, is clearly harmless. And there was also the issue here about the request for your curative instruction. The defendant's position is that the district court should have sua sponte, immediately done a curative instruction in the district court. I think it's clear from the record the district court, if the defendant had asked for one, would have given a curative instruction at the time. In any event, the district court Did she offer? Did Judge Jorkinson offer a curative instruction? She asked the defense counsel whether he wanted a curative instruction. Yes. And in any event, Your Honor, there was a curative instruction of sorts given. The district court, before deliberations, did instruct the jury that the defendant was not on trial for any offenses that were not charged in the indictment. And I think we can presume that the jury followed that instruction. Moreover, the statements the defendant made, in this case to law enforcement, were entirely voluntary, and the Miranda warnings that were given to him were not nullified by any pretextual statements or confusing caveats. And I think the court noted this. What was told to the defendant before Miranda warnings was that they were being given because he was in custody, which the district court found to be an entirely correct statement in the context of him being incarcerated in state prison at the time. And we also know that the statements were voluntary because during the suppression hearing, which the district court itself held, the district court had an opportunity to hear directly from the defendant when he admitted that his statements were entirely voluntary. He also testified that he knew that he could stop the questioning at any time. So if he ran into a part of the questioning where he was uncomfortable, he testified he knew he could have stopped. The case here that the defendant primarily relies on is Duty v. Ryan, which presented an entirely different set of facts. In that case, the defendant was 17 years old, and the detectives kept him up all night from 9.30 until 10 in the morning and with continuous questioning. In that case, the detectives implied that Miranda warnings were a mere formality and they deviated significantly from standard Miranda warnings, including telling the defendant that his right to counsel only applied if he had been involved in criminal activity. Of course, under those circumstances, any request for counsel would be tantamount to an admission of guilt. None of that happens here. Here the district court who conducted the hearing made a finding that the defendant was sufficient age and maturity to understand his Miranda warnings. The interviews here were relatively brief. The first one was two hours. The second one was three and a half, and they were separated by about a year and a half to two years in time. And as I mentioned, the district court found that the agent here didn't deviate from standard Miranda warnings and did not give any confusing caveats. The district court here also made several factual findings that are important to the finding of voluntariness in this case. The district court found that the defendant had previous experience with the criminal justice system and had previously been advised of his Miranda rights. Also, and this is an important point for a number of reasons. The district court here found that it wasn't coercive police activity that impacted the defendant's willingness to speak, and this was after the district court heard him testify at the suppression hearing. It was outside forces, specifically his fear that other inmates might find out about the allegations, and that is what impacted his unwillingness to speak or willingness to speak. And lastly, the district court found that although in a prison setting the interview took place in a large public room, which the district court found actually cut against the finding of involuntariness. Also, there was a delay, rather slight delay, between the start of the first interview where there was Miranda warnings and questioning on the substance of the allegations, but that was a relatively brief period of time. The defendant testified that it was only a half hour or an hour, so any delay here was not inappropriate. In fact, this argument or this type of argument has been foreclosed by Supreme Court precedent. In Colorado v. Spring, the Supreme Court held that mere silence as to the subject matter of allegations do not by themselves invalidate Miranda warnings. And lastly, the district court here actually found that whatever delay there was, again, it was relatively short, an hour, half hour to an hour, was not inappropriate because the agent testified during that time she was trying to build rapport. So not an inappropriate reason to have this rather slight delay before getting into the subject matter of the allegations. So your opposing counsel has argued that the defendant was perhaps suffering from mental illness at the time of these interviews. Is there anything in the record that we can look to to determine if that affected the interrogations? Unfortunately, no, because the issue was not raised below, either orally at the hearing or in writing. So there's nothing in the record addressing this issue. And no good cause having been shown why it wasn't raised below. I don't believe it's properly before the Court here today. I would say, Your Honor, there was an implied finding here. As I mentioned a moment ago, the district court, after hearing directly from the defendant, did find that he was of sufficient age and maturity to understand his Miranda warnings. So perhaps not directly addressing that point, but I think by implication, the district court found here that the defendant was competent to understand his Miranda rights. Also, importantly, Your Honor, this Court has held in cases like Derrick v. Peterson and United States v. Chisholm that personal characteristics, such as a person's mental condition, are only relevant if there is coercive police activity. And as I mentioned a moment ago, the district court found that there wasn't any evidence here that it was outside forces, if anything, that were impacting the defendant's willingness to speak, not coercive police activity. Also, Your Honor, the district court here also correctly declined to subpoena jurors to discuss their deliberations. In this case, the defense attorney claims that he heard two jurors discuss the detective's reference to the defendant's inmate status. This was a statement that was made in open court. The only purpose to subpoena these jurors would have been to talk about whether they discussed it during deliberations, which clearly runs afoul of the Rule 606 near-categorical bar on juror testimony about statements and happenings during deliberations to attack the verdict. This statement was made in open court, so the only purpose of a subpoena would be to inquire into that subject matter. In addition, the exception to this rule that's found in Rule 606b2a does not apply. This statement, again, was made in open court. There was no question that it was made. It was not extraneous under this exception such that it would have allowed juror testimony on this subject matter. This Court's decision in Raley is instructive on this case. In that case, dealt with a defendant's decision not to testify and whether that was discussed during deliberations. And in that case, this Court found that that happened, it was internal and intrinsic to the trial proceedings and was not extrinsic. And so for these reasons, the district court did correctly decline to subpoena jurors to discuss their deliberations. One other point I would like to make is that also with respect to these issues, especially with respect to the issue of voluntariness of the defendant's statements, any error with that regard would have been harmless under Arizona v. Fulminante. Here, with respect to the statements, the evidence here was very strong. The jury heard from two different victims here that testified in granular detail as to the abuse they suffered at the hands of their father in this case over a two-year period of time. The jury also heard the testimony of the defendant in this case. He took the stand and denied these allegations. And so the jury in this case had an opportunity to hear from two victims and the defendant and had an opportunity to judge their credibility over and above these statements that are being challenged. Lastly, the jury here also heard from an expert to explain why disclosure in the case may have been delayed and also to explain why there may have been some differences in the recollection from the two victims. And lastly, the nature of these statements that are being challenged for voluntariness, they certainly show a consciousness of guilt. However, they are far short from an unambiguous confession. So for that reason, based upon the rather ambiguous nature of these statements and the strong evidence, the government's position is here that any error with respect to the admission of the statements would have been harmless. Lastly, the government's expert in this case did not provide any prejudicial character testimony. The defendant on this point is complaining about three different things the expert said. One, that child sex abuser can be in a normal adult intimate relationship, that an abuser can love and care for the child he is abusing, and that abuse can occur without close family members knowing. None of these things provide a profile or describe characteristics of a typical child molester such that this testimony would have run afoul of Rule 404. This Court has approved of this type of testimony on a number of occasions, specifically in United States v. Big Head. This Court approved of testimony about why disclosure from a child sex abuse victim may be delayed. In Holomec and Teos, this Court approved a testimony about grooming, whether that type of activity could be innocent or it could be something else. The language in Holomec is specifically instructive here. This Court held that extensive experience interviewing victims can qualify that person to testify about relationships the victims have with their abuser, and that's exactly what happened here. The defendant on this point relies heavily on United States v. Wells, which provided an entirely different set of facts. That case involved a murder at a Coast Guard station in Alaska. The government presented an expert that testified as to homicidal workplace violence. That expert knew about the specific allegations and facts of the case and also provided testimony during trial of the personality and psychological characteristics of people that engage in homicidal workplace violence. Specifically, that expert testified that those people are generally male, narcissistic, have grandiose views of themselves, and have a sense of entitlement. And in that case, the prosecutor argued in closing that the defendant fit that description to a T. None of that happened here. In this case, the expert witness presented by the government was a blind expert. She had no knowledge of the facts of the case. As I mentioned, she did not describe characteristics of a typical child molester. And lastly, the prosecutor here did not argue that the defendant somehow fit a profile. Rather, in closing argument, the prosecutor cited this expert testimony mainly to argue that to show why disclosure may have been delayed and why recollections may have been slightly different between the two victims, which is testimony that this Court has approved of in the prior cases that I mentioned earlier. I see my time is almost up. Does the Court have any questions for me? No. Thank you. Seeing none, the government would simply ask that this Court affirm. Thank you. And, Your Honor, if I may, the remark I would have is that one of the seminal features of this case is the first trial ended in a mistrial. We can, when we're doing an analysis of whether or not something affected the outcome, probably affected the outcome, might have affected the outcome, the testimony without Garcia, the trial without Garcia ended in a mistrial. The one with him ended in a guilty verdict. Excuse me. Did the defendant testify in the first trial? Yes. And the other thing that's, I think, highly important to this jail interview business is the distinction between interrogation technique and the voluntariness, the rapport. And they always, police officers always say, oh, I'm just trying to establish a rapport. But I urge the Court to take a look in Volume 5 of the Excerpts on Review at about base 1200, where Agent Grant gives what I can only characterize as religious instruction. It sounds like Jimmy Swaggard. I'm dating myself. But there's literally instruction from her stating that God will forgive you and where is your faith, she asks him in the course of this interrogation. Where is your faith in God? It's literally so. So they're using real technique. They want this guy. They spent a lot of time on him. They wanted to come up with something. And they were certainly being inventive. But to overcome the will, I think that is what happened here. I think he was overborn. The combination. Didn't your client testify on cross? And I'll quote the question. So you knew perfectly well at the onset of this interview that you could stop the interview at any time, didn't you? Answer, yes. I don't think he really felt that way. And I don't think that was ultimately his testimony. He testified he felt compelled. And he testified he felt fearful that they would inform, if he refused to speak to them, that they would somehow inform inmates or the staff at the jail, which even the government concedes could be fatal to him. So that's the way I read the record here, Judge. I don't think he came and said I had no fear whatsoever of speaking and I was perfectly comfortable. I don't think that's what he told Judge Jorgensen.  He said, I understood. I could stop the interview at any time. And his answer was yes. Not yes with some sort of amendment. Yes, period. I would urge the Court to take a look at his entire testimony to Judge Jorgensen regarding his expression of fear under the circumstance in that day room being interrogated by these officers with individuals going by which could endanger his life. I just think it's one of the factors. Doesn't that cut against it? Doesn't that suggest that he wouldn't, that he would end the interview rather than have to disclose something in a public place, in a prison, where other prisoners might hear? Doesn't it clear that he would clam up rather than talk? Judge Bivey, did I mention his mental insanity? Well, you did, but that didn't, unfortunately, that didn't get us very far. I don't have a psychological explanation as to what quirk of this man's mental infirmity would cause him to do what he did. Yeah, but the circumstances that you've cited seem to cut against the point that you're making. It seems to suggest that he would have stopped the interview rather than have to talk with them in a place where there might be other prisoners that would overhear something. I would point out first, the officers selected the venue. Now, the first time might have been an act of convenience. The second time certainly was not. That was a coercive measure on their part. It had been effective in getting him to speak before, and it was effective the second time. So in terms of, I can't think of a more uncomfortable, unsafe, dangerous situation than to do what was done here, regardless of the motivation. Their motivation was to obtain a confession and squeeze him. And they did, and they didn't get much, but they got what they got, and it was the centerpiece, the centerpiece of the government's case. These rolling transcripts they used on video, both times, and that they showed these interviews were so important. The first jury, the interview of 215 was two minutes, or two hours, and they showed one hour and 16 minutes to the jury of that video. The other was three hours and 27 minutes on 2017, and the jury was shown two hours of this, audio, live audio with a rolling transcript. If you haven't seen this, you should take a look. The government audiovisual people outdid themselves here. But this was the very centerpiece of the government's case, this interview. It's critically important, and it was conducted in such a manner. I don't believe it should have been presented to the jury. All right. So you are over time. Yes, ma'am. Any other questions? I see no other questions. Thank you both, counsel, for your arguments this morning. This case is submitted. Thank you, sir.   Thank you, Mr. Court.
judges: HAWKINS, BYBEE, BADE